215 W 88 LLC v Sitney (2024 NY Slip Op 50208(U))

[*1]

215 W 88 LLC v Sitney

2024 NY Slip Op 50208(U)

Decided on February 29, 2024

Civil Court Of The City Of New York, New York County

Stoller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 29, 2024
Civil Court of the City of New York, New York County

215 W 88 LLC, Petitioner,

against
Julie Sitney and Blake Adams Sitney, Respondents.

Index No. 311721/2022

For Petitioner: Belkin Burden Goldman by David Skaller and Daniel Phillips
For Respondent: Himmelstein McConnell Gribben & Joseph by William Gribben

Jack Stoller, J.

215 W 88 LLC, the petitioner in this proceeding ("Petitioner"), commenced this holdover proceeding against Julie Sitney ("Respondent"), a respondent in this proceeding, and Blake Adams Sitney ("Co-Respondent"), another respondent in this proceeding (collectively, "Respondents") seeking possession of 215 West 88th Street, Apt. 4H, New York, New York ("the subject premises") on the basis that Respondent is a rent-controlled tenant who failed to maintain the subject premises as her primary residence and that Co-Respondent's occupancy was derivative of Respondent's tenancy. Respondent interposed an answer with a defense of excusable absence. The Court held a trial of this matter on July 18, 2023, October 11, 2023, November 21, 2023, January 16, 2024, and adjourned the matter to February 9, 2024 for post-trial submissions.
The trial record
Petitioner proved that it is a proper party to commence this proceeding; that Petitioner is in compliance with the registration requirements of MDL §325; that the parties are in a landlord/tenant relationship with one another; that Respondent is subject to the Rent Control Law; and that Petitioner caused a predicate notice to be served on Respondent, service of which was complete as of June 29, 2022.
The parties stipulated that from March 21, 2020 through July 13, 2022, Respondent was at the subject premises in the afternoon thirty-two times and at the subject premises overnight for an additional sixteen times. The parties stipulated to Respondent's joint federal and state tax returns with her husband, Jonathan Delson ("Respondent's Husband") in 2019 and 2020 showing 18 Browns Lane, Saugerties, New York ("the Other Address") as Respondent's address; a number of 1099 forms from 2019 and 2020showing the subject premises as Respondent's [*2]address; Respondent's bank statements for one bank from October of 2019 through May of 2022 and for another bank from September of 2020 through January of 2021 showing the subject premises as Respondent's address; bank statements from a joint bank account with Respondent and Respondent's Husband showing the Other Address as Respondent's address from December of 2018 through April of 2020; Respondent's voter registration showing that she was registered to vote at the subject premises; Respondent's driver's license showing the subject premises as her address and that Respondent was at least seventy years old as of March of 2020; statements for car payments showing the Other Address as Respondent's address from September of 2019 through January of 2021; a vehicle registration issued August 21, 2022 showing the Other Address as Respondent's address; EZ Pass statements mailed to Respondent at the Other Address from October of 2019 through April of 2020; credit card statements for three credit cards mailed to Respondent at the subject premises from January of 2020 through August of 2022; documents showing Respondent's ownership of the Other Address together with Respondent's Husband and incidents of ownership thereto, such as home insurance and property tax bills; an acknowledgment of jury service in Manhattan sent to the subject premises in January of 2020; health insurance documents from May of 2022 mailed to Respondent at the subject premises; Amazon records showing items shipped to the subject premises in 2019 and then the Other Address after 2020; statements for Respondent's retirement account mailed to her at the subject premises for quarters ending March of 2020 through September of 2022; statements of Respondent's e-Trade account mailed to her at the subject premises from March of 2020 through October of 2022; bills for cable service at the subject premises mailed to Respondent there from 2019 through February of 2022; Con Edison bills for the subject premises in the name of Co-Respondent from July of 2019 through January of 2023; and Respondent's vaccination records, which show that she received the Covid vaccine on January 27, 2021, February 24, 2021, October 27, 2021, and March 31, 2022.
Respondent's Husband testified that he lives in Saugerties, New York; that he is Respondent's husband; that they met on July 8, 1994; that they married on May 7, 2006; that he and Respondent are the grantees on a deed for his home at the Other Address; that Respondent did not pay him for the Other Address; that the Other Address is 400 feet to the next house to the north, 500 or 600 feet to the next house to the south, and there is no house to the west of the Other Address; that before March of 2020 he lived in the Other Address and Respondent was living at the subject premises; that they visited each other on occasional weekends and sometimes during the week; that as of March of 2020 Respondent temporarily relocated to the Other Address; that he is familiar with the subject premises; that at the front door on 88th Street there is a doorman that you pass, within a couple of feet; that there are two elevators in the lobby and a mailroom to the side; that there were people at the elevator or in the elevator; that he would come in contact with four or five people on average; that they came in contact with no people at the Other Address after March of 2020; that he owns a computer repair and consulting firm; that he had visited clients in their homes before March of 2020; that after March of 2020 he stopped going to clients' homes; that he would either repair computers remotely or have clients drop computers off in his driveway and he would wipe them off; that he was concerned about Covid and he was concerned about Respondent's health; that Respondent and he ordered groceries to be delivered and they cooked in his home; that they would leave groceries on the table and then he would get them; that they did not go out to eat; that during the pandemic he and Respondent vacationed to a beach at Cape Cod by car, a four-hour trip from the Other [*3]Address; that they would stay at a hotel; that he made sure that a hotel followed Covid policies, had no housekeeping, and that they had minimal contact with people; that they did not have friends over at the Other Address; that Respondent's grandchildren stayed at the Other Address starting around June or July of 2021; that they were not in school; that they went to school eventually; that he drove them to school; that the school had Covid protocols, including masks; that he knew about the eviction notice; and that Respondent was flabbergasted and traumatized by the notice.
Respondent's Husband testified on cross-examination that he does not want to see Respondent lose the subject premises; that he would do anything within his power to keep that from happening; that his grandchildren were going to school in Woodstock from the fall of 2021 through the end of the school year in 2022; that he does not remember if Respondent went to school with them; that Respondent loves her grandchildren; that it is possible that Respondent would not know about Covid policies at the school; that his grandchildren were not vaccinated until the end of 2021; that he had unvaccinated grandchildren living with them until the end of 2021; that there were strict policies at the school about distancing and masking; that the building in which the subject premises is located ("the Building") had protocols about Covid, including a mask policy; that Respondent came to the Other Address on March 20, 2020; that he would drive Respondent to the subject premises on occasion after March 20, 2020; that he was always present with her when she visited the subject premises; that Respondent came to the subject premises to pick up and mail and check on the subject premises; that the doorman had a mask on; that he took the elevator on that date; that he felt safe if no one was in the elevator; that the Building has two elevators; that Respondent did not want to be in New York City at that time; that he did not remember that Respondent took a trip to Lake Placid; that Respondent does not have a house in Lake Placid; that Respondent went to Maine; that Respondent likes to do things by herself; that Respondent sometimes liked to be by herself; that Respondent went to museums and ballets; that Respondent drove to Maine; that he knew that Respondent would take proper protocols at Lake Placid; that he did not know if hotels would follow protocols; that Respondent was not vaccinated in July of 2020 when she went to Maine; that Respondent based her visits on representations from hotels about cleaning protocols; that he did not go to Maine with Respondent from August 14, 2020 until August 21, 2020; that he did know if he went to Cape Cod with Respondent from October 1, 2020 to October 5, 2020; that Respondent took a ferry to Nantucket; that he has been on the ferry at that time of the year; that the ferry has outside spots and it was not terribly crowded; that he was not overly concerned because she took precautions; that the City was much more dangerous than the Other Address because of density; that he believed that it was okay to be at hotels in Cape Cod or Maine; that he did not remember discussing cleaning protocols in the Building with Respondent; that he felt comfortable for a short period of time coming in and out of the Building; that he would park in the street; that he walked past other people in the street; that he knew that people had fled New York City; that he was not aware that Respondent said that the Covid outbreak was as bad in Saugerties as it was in New York; that Co-Respondent and Co-Respondent's family would come to the Other Address occasionally; that he did not recall if Respondent's daughter came to the Other Address; that they did not have friends over in 2021 and 2022; that he has not seen Respondent's calendar for 2021 or 2022; that Respondent went to the local liquor store in Saugerties on occasion before the vaccine; that Respondent did not go to a large supermarket, which is larger than any supermarket in New York City, in Saugerties; that Respondent was safer in Saugerties than in New York [*4]City; that he did not eat indoors at a restaurant from March of 2020 through July of 2022; that he ate in a restaurant by July of 2022; that it is possible that Respondent would have eaten in restaurants as of January of 2022, because she was vaccinated; that Respondent did not move back to the subject premises in January of 2021 because they believed that it was safer in Saugerties even though they occasionally ate in restaurants; that he was probably with Respondent when she stayed in the subject premises from March 25, 2021 through March 28, 2021; that they did not go grocery shopping at that time; they got food delivery; that he has never gotten groceries delivered in Manhattan; that they still thought it would be safer to be in Saugerties in 2021 than on the Upper West Side; that this belief changed in July of 2022 when Respondent's grandchildren moved back to Thailand; that Co-Respondent and Co-Respondent's wife lived in the subject premises for a year before Respondent moved back in; that he is not sure if Respondent stayed with them; that Respondent spent the night in the subject premises with Co-Respondent and Co-Respondent's wife on many occasions; that Co-Respondent and Co-Respondent's wife went back to Thailand once it was safe to do so, around the same time that Respondent relocated back to the subject premises; that in April of 2022 he flew to Santa Fe; that he went to Colorado in July of 2022 around the time that Respondent went back to the subject premises; that he drove back from Colorado; that he drove straight to Saugerties; and that he picked up his car at Laguardia Airport and drove to Saugerties.
Respondent's Husband testified on redirect examination that the grandchildren were in Saugerties to go to school; that from March of 2020 through July of 2022, Respondent was not in New York City very often; and that Respondent was in Saugerties for her and Respondent's husband's safety.
Faroush Safavi ("Respondent's Friend") testified that she lives on Riverside Drive in Manhattan; that she has known Respondent since 2017; that they are members of a woman's drumming group; that before March of 2020 they met once or twice a week at the subject premises; that the group has about ten to twenty members; that the group stopped meeting in March of 2020 because of the pandemic; that she is a physician and medical director at a biotech company; that they ceased contact because the Centers for Disease Control ("CDC") said to isolate; that she lived about a block from the subject premises in March of 2020; that she saw ambulances take bodies out; that she left the neighborhood and moved to Woodstock in April of 2020 because she wanted to isolate; that it was scary because she saw neighbors' furniture on the sidewalk and she heard that neighbors died; that she stayed in Woodstock throughout 2020; that they had virtual meetings; that the music group started meeting at the subject premises in 2022 after things calmed down; that they met in the living room of the subject premises; that she had been in the kitchen; that there is an office where they dropped their bags; that there is a bathroom; that she did not notice any changes in the furnishings in the subject premises; that there was a dining table at the end and bookcases and drumming instruments and a computer and couch in the office; and that in 2022 she observed no difference in the furnishings.
Respondent's Friend testified on cross-examination that she is a cancer researcher; that she worked in Times Square five days a week before Covid; that on March 7, 2020 her office closed because there were several covid cases; that she moved back to New York in December of 2020 when things got safe; that she did not feel safe but she had to come back for work; that her company kept offices closed; that her office opened at the end of 2021; that she went back and forth from Woodstock to New York; that she spent two days a week in New York; that she did not go back to work five days a week at the end of 2021; that she only goes to the office [*5]when there is a meeting, every few weeks; that they still are remote; that her employer is trying to get her to work in person; that she purchased her apartment in May of 2022; that she went to grocery stores at end of 2020 with two masks on; that there were lines at the grocery store; that there were safety protocols at the grocery stores; that her apartment was a block from the subject premises; that she went to a grocery store on 85th Street; that the situation was not the same in December of 2020; that she was in contact with Respondent from April of 2020 through July of 2022; that they planned on seeing each other in Woodstock but they did not see each other because Respondent was sick; that she did not tell Respondent to move back in 2021; that her group started to meet again in the subject premises in January of 2022 as soon as Respondent came back; that she does not know if the exact date was October of 2022; that she does not know where Respondent slept; that she did not see a bed in the living room; that the Building has fourteen or fifteen floors; that there are two elevators; that her old apartment was a brownstone walk-up; that she had rented that apartment; that the Building is a cooperative; that there is a doorman and porters; and that she moved into an elevator building because she wanted a building with staff.
Co-Respondent testified that he lives in Thailand; that he is Respondent's son; that he grew up in the subject premises; that he was born on July 26, 1969; that he lived in the subject premises until he was eighteen years old; that he went to college in Santa Fe; that he is an information technology specialist; that he runs a company; that they are data compilation experts; that he is married and has three children; that in January of 2020 he was living in Thailand; that he had been living in Thailand for nine years as of 2020; that his wife is from Thailand; that he was aware of the pandemic; that Thailand did well in the pandemic initially; that at one point the medical situation in Thailand became desperate; that he was unable to get vaccines; that he thought he should come to the U.S. to get vaccines; that he came to the U.S. on July 4, 2021; that it was hard to find a flight because of lockdowns; that he was planning on coming to the subject premises; that he did not know how long they would have to stay in the U.S. and the subject premises was available at the time and it is comfortable and he knows it well; that in July of 2021 no one was occupying the subject premises; that Respondent was social-distancing in Saugerties with Respondent's Husband; that they talked about how to arrange their living situation in a way that would be safest for them; that they decided that Respondent would stay in Saugerties and that he and his family would stay in New York; that his wife and children moved into the subject premises and Respondent stayed in Saugerties for most of the time that he was in the subject premises; that they got vaccinated in New York; that he and his wife were vaccinated on July 5; that his children were under 10 years old and vaccines had not been authorized for children under that age at that time; that he has two boys and a girl; that they were 9, 7, and 4 years old at the time; that vaccines were available to the 9- and 7-year old in November of 2021; that he thinks that they got vaccines the very day that they were allowed to; that they were planning to stay in New York until they were all vaccinated and boosted; that children had to be five years old to be vaccinated; that they wanted to come back to Thailand, where his kids are in school and where he has a house; that Respondent was also coming back to the subject premises; that his youngest daughter turned five on March 3, 2022; that his daughter was vaccinated within a day of being eligible; that his daughter got the second shot in the spring of 2022, around June; that he left the subject premises in July of 2022 after everyone was vaccinated and boosted; that they purchased tickets before being served with a predicate notice and came back to Thailand; that there were postings about pandemic in the Building about [*6]limiting the number of people in the elevator and the mailroom, masking, and social distancing; that it was impossible not to make contact with other people in the Building; that he was in contact with people in the hallways, the mail room, the elevators; that he never saw elevator buttons being sanitized; that some people were masked and some weren't; that Respondent came to the subject premises; that Respondent is his children's grandmother; that mental health has to be factored in; that Respondent would mask up and Respondent was vaccinated; that everyone who could be vaccinated was vaccinated; that they would eat at outdoor restaurants; that they did their best to limit exposure; that he decided to enroll his children in school; that it was hard to find a school; that they found a school in Kingston, New York; that he has providing money for Respondent for many decades; and that he gave Respondent the same amount of money once he was no longer in the subject premises than when he was.
Co-Respondent testified on cross-examination that he was aware of the Covid conditions in New York City in July of 2021; that he knew that Respondent had moved out of New York City to protect herself from Covid; that he did not know that his children could not be vaccinated at the time that he moved back to New York; that he was expecting authorization shortly; that there were lockdowns that precluded him from leaving Thailand earlier than July of 2021; that his children first went to school in December of 2021 after arriving to New York; that his daughter had a Montessori program that she went to; that his daughter started that in November; that his daughter was not vaccinated from November until March; that his sons were vaccinated on November 22 and December 13 of 2021; that his daughter was vaccinated for the second time at the CVS on the East Side because the CVS on the west side did not have needles for children; that the Village Apothecary rings a bell; that he thought it was on the East Side; that he did not recall the exact date of the vaccination, but May of 2022 sounds about right; that he did not move back to Thailand in May because his boys' school ended in June; that he did not move in June because he wanted to make sure that everyone was boosted and there were travel arrangements; that it was shortly after they were boosted that they purchased their plane tickets; that they took a trip by plane to Santa Fe before his daughter was boosted; that there was a house in Santa Fe where ten people were staying; that with everyone vaccinated he felt that it was safe to travel on a plane; that his understanding was that airplane travel was high-risk; that Respondent came on that trip; that he stayed in a hotel in Santa Fe the night before he flew back to New York; that the hotel did not have an elevator; that he thought it was best for Respondent to be in Saugerties; that Respondent could not live in the subject premises because he was living there; that his sons were born in New York; that they moved for Thailand when his younger son was six months old; that he lived with his wife and Respondent at the time for two-and-a-half years; that he and his family used the two large back bedrooms; that Respondent slept between the living room and the smaller bedroom; that he stayed in the two back bedrooms and the small bedroom in 2021; that on several occasions Respondent would use the small bedroom and they would make room for Respondent; that they changed the furniture arrangements; that they moved the bed out of the living room so that no one would be sleeping there; that maybe in Respondent's early visits she slept in the living room; that he moved the bed out of the living room about four or five months into their stay; that Respondent could have stayed in the living room or the small bedroom; that they used the small bedroom on occasion for storage of some items when Respondent was not there; that he did not look to rent an apartment in New York City; that he had heard that there were deals for rentals at that time; that he did not rent an apartment because he did not know when he would be leaving; that he did not look for a month-[*7]to-month rental because it would not make sense; that there were safer places in the U.S. to live in; that the reason he came to New York because New York is his home; that he has strong feelings and connections to the subject premises; that he did not want Respondent to lose the subject premises; that he can work remotely; that he did not complain to Petitioner about unmasked people in the Building; that he and his wife went to grocery stores; that his wife shopped a few times a week; that he came home to Thailand in late June of 2022; that he purchased tickets in June 22, 2022; that he got Covid when he returned to Thailand even though he was vaccinated and boosted; that the whole family got mild cases of Covid; that he went to Cape Cod in 2021; that his family stayed in a hotel that was not a high-rise hotel; that it was a Marriott-Bonvoy hotel so he felt that their cleaning standards were acceptable; that he is aware of stories about inadequate cleaning at hotels; that he ate at restaurants outdoors in Cape Cod although there may have been a time when they went to a restaurant inside; that he visited Respondent upstate; that even though Respondent was in Saugerties she prefers to be in New York City for culture and restaurants and her grandchildren; that there is nothing to do upstate; that Respondent prefers the urban lifestyle; that Respondent spent the vast majority of her time in Saugerties from March of 2020 through July of 2022; that Respondent social-distanced in New York City; that on rare occasions they ate in restaurants inside in New York City; that two of the grandchildren lived with Respondent after they were vaccinated; that he had some awareness of Covid rates in Kingston in 2022; that there were no field hospitals or trucks with dead bodies upstate; that in July of 2021 they were not there to the same extent as earlier; that he did not move to Saugerties because he wanted to social distance from Respondent except for shorter visits; that he looked into vaccination rates in Ulster County and New York City; that Manhattan was one of the most highly-vaccinated places in the world; that the Kingston school required that students be vaccinated; that he did not inquire whether there was a vaccination requirement because his children were vaccinated; that he did not know if the teachers were vaccinated; that the precautions that they took were sufficient; that Respondent was bequeathed single-tenant ramshackle apartments in Idaho that are rented out; that he lived in Seattle in 2005; that he moved to New York because there are great medical facilities in New York, that he wanted Respondent to see her grandchildren; that he did not just pay Respondent for the cable and electric; that he has been sending Respondent $20,000 every year for decades, although the amount went up over time; and that the cable at the subject premises was not in his name.
Co-Respondent testified on redirect examination that his daughter was boosted on May 23, 2022; that there was a two-week waiting period to see if there were any adverse affects; that he took a Covid test before going to Santa Fe; that he understood that they all took Covid tests before going; that he understood that the MRNA vaccines were better than the Chinese vaccines available in Thailand; and that he gave Respondent money to help her financially.
Respondent testified that she was not living in the Other Address in 2006; that she was living in the subject premises in 2006; that Respondent's Husband lived in the Other Address by himself although Respondent's Husband's son may have been living there at the time; that they agreed that she would live in the subject premises and Respondent's Husband would live in the Other Address because they planned to see each other on holidays, weekends, and vacations, as he likes to live in the country and she prefers to live in the city; that the Other Address is isolated and in the woods and you have to drive everywhere; that she was a mother and had a job in publishing; that she took classes at night and obtained bachelor's and master's degrees; that she studied music and photography; that she went to Broadway shows, concerts, and the opera; that [*8]she has studied various instruments over the years; that she has been involved in music groups, most recently a percussion group; that the percussion group met in the subject premises; that they would get together and have practice sessions; that when she was working she would go to the Other Address Fridays after work and would take an early train on Mondays to go back to work; that sometimes Respondent's Husband came into the city; that she was in the subject premises most of the time not only in 2019 but 2016, 2017, and 2018 as well; that in March of 2020 the pattern changed because of the onset of the Covid pandemic; that the subject premises was fine but she wanted to temporarily relocate to the Other Address because she knew that she would have to isolate to stay safe; that she thought that if everything was shutting down she would rather go to the Other Address; that she returned to the subject premises two-and-a-half years later, around July of 2022; that her occupancy of the subject premises resumed as of that point as it had been before the pandemic; that she had made no changes to the subject premises; that she had not removed furniture from the subject premises; that she had taken clothing from the subject premises; that in March of 2020 she took the same amount of clothing with her as if she was going away for a few days; that she keeps important documents in a big brown folder; that she has a cabinet where she keeps her birth certificate, Social Security card, tax records, and credit card statements; that she is retired; that she has a retirement account; that she continued to maintain those records in the subject premises; that she has a passport which she maintains in the subject premises; that she might have retrieved her passport from the subject premises later on; that she knew that Co-Respondent and his family were in the subject premises as of 2021; that the nearest house to the Other Address was about an eighth of a mile away from the Other Address; that from March of 2020 through July of 2022, she would typically wake up, drink tea, bathe, dress, check email, check news, and take care of her dog who was there; that she had lots of contact with Respondent's Husband; that they talked to each other; that Respondent's Husband had to work; that Respondent's Husband was on the phone; that she did her own thing at the Other Address, such as read books or look at the internet; that she went into the yard; that she did not have contact with anyone in the Other Address; that the amount of time she spent in New York on various trips that averaged out to an afternoon; that if she stayed it was because she wanted to stay in the subject premises for a while and get away from Saugerties; that she is attached to the subject premises and she wants to be around her things that are there; that on July 29, 2020 she went to Maine; that she drove to Ogunquit because there is a beach up there; that she drives to mid-coast Maine; that she most likely stayed at a hotel that she had been to previously; that their website stated Covid precautions; that she was in Cape Cod for a little getaway; that she likes to be near the water; that she likes whale-watching; that she does not remember if she whale-watched on this trip; that in 2021 she went to Maine again; that she generally went to the same hotels; that she went to Cape Cod again; that sometimes Respondent's Husband came with her; that she looked on the website to see about Covid precautions; that another reason to go back to the subject premises was to make sure that there were no leaks in the subject premises; that she noticed warnings about the pandemic at the Building that advised to wear a mask, to restrict the people in the elevator, and to keep a distance; that people generally abided by the guidelines in the Building; that the only person she saw at the Other Address was Respondent's Husband and Respondent's Husband's mother who lived nearby; that she saw many people in the Building; that occasionally there were people in the mailroom; that she saw a lot of people in the hallway and on the street; that she was getting vaccines on a regular basis when they because available; that she did not return to the subject premises after [*9]the second booster on March 31, 2022 because Co-Respondent's family was using the subject premises; that she did not use the subject premises more often because Co-Respondent's family was there; that when Co-Respondent's family came and stayed in the subject premises and all five of them were there it felt crowded; that there was a time when two of her grandchildren lived with her in the Other Address; that there was a routine that they developed; that she was taking care of her two grandsons who were living with her and attending school and she had to keep up that routine; that she wanted the children to finish the school year so that they would get credit for it; that she has hypothyroidism, Kashimoto's disease, prediabetes, high blood pressure, high cholesterol, and a tremor in her left hand; that she consults with doctors regularly; that she has several doctors; that she discussed Covid as it related to her conditions; that she told her doctors that she was isolating outside of New York City; that Respondent's Husband and the tax preparer put the Other Address as her address on the tax return because there wasn't room to put the subject premises on the return; that the tax return said that she was in New York City in 2020 because she was paying rent and maintaining a home in that year; that she did not know if she paid New York City taxes in tax year 2020; that she left the subject premises as her address on her bank statements because she was always going to return to the subject premises; that she keeps her car in Saugerties; that she has an EZ Pass in her name at the Other Address; that she does not drive in New York City; that her Medicare Rx document is very important to her; and that she kept the credit card and retirement account statements in the subject premises because she did not know how long she would be away.
Respondent testified on cross-examination that the joint bank account statements are mailed to the Other Address; that tax returns were at the Other Address; that her tax returns are important documents; that her car is registered at the Other Address; that her car insurance lists the Other Address; that she bought the car in the area of the Other Address in the last four years; that her EZ Pass uses the Other Address; that she inherited some properties in Idaho and Washington when her father passed about ten or twenty years ago; that she was married at the time; that the documents for that go to the Other Address; that those documents are important documents; that she is on the deed for the Other Address; that the deed says that she was "residing at [the Other Address]"; that she most likely read it; that she said that was a mistake and that that should not have happened; that the Other Address has three bedrooms and one-a-and-half bathrooms; that she worked for fifty years in New York City, mostly in publishing; that she retired about seven years ago; that she worked five days a week before that, except four days a week in the last couple of years before she retired; that she had to be in New York when she worked; that after she retired her time was more flexible; that her living pattern changed when she retired; that she left New York and went to Saugerties on March 21, 2020; that she was concerned about Covid, the elevator in the Building, and the density in New York; that the elevator was a minor reason because she could take a staircase; that she was partly concerned about going to stores in New York; and that she did not remember if doctors told her to stay in Saugerties; and that her deposition testimony that no doctor told her to go to Saugerties instead of New York was accurate. Petitioner's attorney read into the record deposition testimony of Respondent stating that no medical condition she had that made it so that she had to be in Saugerties for medical reasons as opposed to New York City.
Respondent testified on cross-examination that the statement in the answer that Co-Respondent moved out of the subject premises is true; that Co-Respondent moved out in July of 2022; that part of the reason why she was not living in the subject premises was because Co-[*10]Respondent was living there; that she constantly came back to the subject premises; that she was back and forth; that she might have underestimated the number of times she was in the subject premises; that she took the elevator to the subject premises on April 19, 2020; that she thought Respondent's Husband drove her to the subject premises; that there were other people on the sidewalk; that there was building personnel in the subject premises; that she took the elevator to the subject premises; that she never had her mail forwarded; that she could have asked building personnel to check on the subject premises but chose not to; that she repeated this process on June 18, 2020, July 3, 2020, and July 10, 2020; that she might have said that Covid was as prevalent in Saugerties as in New York; that she would have preferred to be in a hospital in New York rather than Saugerties; that she became a recluse at the Other Address; that on June 12, 2020 she went to Lake Placid by herself and stayed in a hotel; that she went out for meals at Lake Placid; that she only went to an outdoor restaurant; that she went to an indoor food market in Woodstock on June 16, 2020; that there was an entry in her credit card records for a liquor store; that Respondent's Husband may have gone in; that she remembered handing the card to Respondent's Husband; that Respondent's Husband would often go to Walgreen's and use her card to get prescriptions; that at the end of July she went to Maine and stayed in a hotel; that she did not remember if Respondent's Husband was with her; that the hotel advertised that there was a twenty-four hour wait in between guests; that she did not have cooking facilities in the hotel in Maine; that she did not know how many people would be at the hotel or in the lobby or in a restaurant before she left for Maine; that she did not remember if there was an elevator in the hotel; that she went back to Maine again, from August 4, to August 8; that she mostly likely ate in a restaurant in Maine; that she went to a botanical garden in Maine; that she did not know how many people would be around; that she wore a mask; that she did not know if other people wore a mask; that some people were not wearing masks; that to a certain extent the mask was helping; that after she was vaccinated she felt safer with a mask on; that she eventually overcame her fear of being in an elevator with a mask on; that she went to Maine again in September of 2020; that her credit card records show charges in restaurants in September of 2020; that she did a whale watch on that trip; that she waited on a line; that in September it was busy in Maine; that the boat was crowded; that most people were wearing masks; that she was wearing a good mask, the kind that they wear in hospitals; that she went to Saugerties after this trip; that she went to Cape Cod on October 1, 2020; that she also went to Nantucket; that she spent the night in Cape Cod; that she did not remember whether she was by herself or with her husband; that she had to take a ferry to Nantucket; that she most likely sat outside on the Nantucket ferry because she was photographing; that it is possible that she went inside the ferry at some point; that there were no cooking facilities at the lodging in Nantucket; that she went to a bookstore in Nantucket; that she did not remember if the people were wearing masks but she was wearing a very good mask; that the Building had a policy about masks and an elevator; that there are two elevators in the Building; that she might have taken the staircase on occasion; and that on January 27, 2021 she was vaccinated in Saugerties. Petitioner's attorney read into the record deposition from Respondent that New York City was "much safer" once the vaccine was available.
Respondent testified on cross-examination that she did not try to follow when things in the City were opening; that she was following the news; that she got a second vaccine shot on February 24, 2021; that she stayed in the subject premises from March 25 through March 27 of 2021 because she needed a change of scenery, but more than that, because it was her home; that she did not remember what she did for those three days; that she might have gone to a grocery [*11]store; that the Building is at the corner of Broadway and 88th Street; that Central Park and Riverside Park are walking distances of the Building; that it is possible that she did not go to the parks in March because of the weather; that most likely she went to a grocery store a few times while she was there; that she went back to the subject premises in April of 2021; that she went to a very large grocery store in Saugerties during this time; that she might have given Respondent's Husband her credit card; that most people were wearing masks at this time; and that went to a salon during this time. Petitioner's attorney read into the record Respondent's answer in her deposition testimony as to why she did not move back to the subject premises at around this time: "Because I . . . had a choice of where I wanted to be. And I knew that I wasn't going to go to the concerts and the museums and I wasn't even going to hang out with my friends . . . I wanted to be where I . . . was more comfortable."
Respondent testified on cross-examination that in Saugerties she had food delivered; that she did not choose to so that in New York; that she and Respondent's Husband stayed in a hotel in Bethesda; that she did not remember if the hotel had an elevator; that she went to the Space Center in Bethesda; that in June of 2021 she went to Maine, maybe with or without Respondent's Husband; that she did not go to stores but she may have gone to a restaurant; that she went to Hyannis Port; that in June she went to a funeral and a church indoors; that she and Co-Respondent chose to have Co-Respondent stay in the subject premises; that on or about 2016 her grandsons stayed in the subject premises and went to school from there; that at the time of the birth of her son's second child they lived in the subject premises for some amount of time; that she lived with Co-Respondent, his wife, and the two boys; that she had her own room during that time; that Co-Respondent then had a third child; that she still had a room available in the subject premises for her when Co-Respondent was staying in the subject premises; that in August of 2021 she went to Cape Cod, and then went there twice more in September of 2021; that she took her grandchildren and Respondent's Husband with her on these trips, although she did not remember which one; that she went to an ice cream shop and a candy store and art galleries in Provincetown; that she looked into stores to see if they were crowded before she went in; that New York is always crowded; that she got her third vaccination in October of 2021; that her family being there was one of the biggest reasons that she did not come back to the subject premises; that she went to bat mitzvah in the fall of 2021; that she guessed that most of the attendees there were vaccinated; and that she had Thanksgiving in 2021 at the Other Address. Petitioner's attorney read into the record Respondent's deposition testimony that Respondent had thirteen people over the first night and seventeen people the second night.
Respondent testified on cross-examination that she went to Whole Foods across the street from the Building multiple times during the pandemic; that she got her fourth vaccination on March 4, 2022; that she did not go back to the subject premises at that time because her family was there; that in April 8, 2022 she flew to Santa Fe with her family; that her family rented a house; that they went to outdoor restaurants there; that she went to Musick Pennsylvania in June of 2022 because she brought her grandsons to a camp; that she was only there for one night; that she went to a restaurant there; that on July 13, 2022 Co-Respondent and his family flew back to Thailand; and that she resumed occupancy of the subject premises after that. Petitioner's attorney read into the record Respondent's deposition testimony that on July 18, 2022 Respondent flew to Colorado and stayed in a bed-and-breakfast. Respondent testified on cross-examination that she contracted Covid in Colorado and drove back to the Other Address, not the subject premises; that Co-Respondent was out of the subject premises at that time so it was hers [*12]again; that she moved back to the subject premises after the service of the predicate notice; that she knew that the hospitalization rate in Saugerties was pretty bad; that Co-Respondent was paying cable for years; that her grandchildren came to Saugerties and went to school there; that she did not know the vaccination policy for the school; that she did not know whether the students or teachers had to be vaccinated; that even though her log says she spent 238 days in the subject premises in 2019 her tax return said she spent 365 days in 2019 because the subject premises is her legal residence; that in 2020 her tax return said that she spent more time in the subject premises than the twelve days because her tax preparer prepares the return, not her; that she isolated when she went to the Other Address; that she wore a mask when she went to public places; and that she did not move back to the subject premises when she got her first vaccine. Petitioner's attorney read into the record Respondent's testimony at her deposition to the effect that she did not know why she did not move back to the subject premises after being vaccinated, although she added that everything she did in New York City that made her life really important there was closed down, and later added that she did not move back to the subject premises because Co-Respondent was living in the subject premises.
Petitioner's attorney read into the record Respondent's deposition testimony that airports were one of the least safe places to be; that she wanted a little adventure; that she was vaccinated and boosted, so they decided to take the risk; that she could not move back to New York City because it was too crowded; that things were still closed down in the city and she could not do the things that she really loved to do; that she at least was not by herself at the Other Address because Respondent's Husband and her dog were there; that she went to opera and ballets and galleries most of the time by herself; that she was comfortable if people were wearing a mask around her; and that she overcame her fear of being in an elevator.
Respondent testified on redirect examination that Respondent's Husband has always lived at the Other Address; that in 2018 and 2017 she mostly stayed at the subject premises during the week and mostly stayed in the Other Address during weekends; that she was aware about recommendations as to social distancing; and that she practiced social distancing.
Discussion
In order to meet its burden to prove that Respondent failed to maintain a rent-controlled apartment as her primary residence, Petitioner had to prove that Respondent did not maintain an ongoing, substantial, physical nexus with the subject premises for actual living purposes. Emay Properties Corp. v. Norton, 136 Misc 2d 127, 128-29 (App. Term 1st Dept. 1987), Johnson v. Smith, 53 Misc 3d 144(A)(App. Term 2nd Dept. 2016).[FN1]
Most significantly, Respondent had a presence in the subject premises for only 5.6% of the days in between March 21, 2020 and July 13, 2022 and only spent the night at the subject premises for 1.4% of those days. Respondent did not return to the subject premises until after Petitioner caused the predicate notice to be served purporting to terminate her tenancy. In the interim, Respondent slept in a home where her spouse has been living full time for many years, a home which she co-owns as a tenant of the entirety, and the home at which Respondent registers her vehicle and files federal income taxes. On such a record, Petitioner has proven as a prima facie matter that Respondent failed to [*13]maintain the subject premises as her primary residence.[FN2]

Rent and eviction regulations for Rent-Controlled apartments define "primary residence" so as to excuse temporary periods of relocation that do not count against claimants to succession. 9 N.Y.C.R.R. §2200.3(j)(3). While the regulation provides for specific examples of such a temporary relocation, it also allows for an excuse based on "other reasonable grounds . . . ." 9 N.Y.C.R.R. §2204.6(d)(vi). Respondent argues that she proved that this exception encompasses her relocation to the Other Address, as she relocated from her densely-populated building on the Upper West Side of Manhattan to the isolated setting of the Other Address in order to protect herself from Covid exposure.
The Court can take judicial notice of matters of common and general knowledge, Leser v. Penido, 2013 NY Slip Op. 30352(U)(S. Ct. NY Co.)(Feinman, J.), if they are so notorious as to make it proper to assume their existence without proof. Walker v. City Of New York, 46 AD3d 278, 282 (1st Dept. 2007). As the Court noted on the record, the Covid-19 pandemic, starting around March of 2020, reached that level of notoriety. The Court not only takes judicial notice of the pandemic itself, but the Court also takes judicial notice that widespread information available at the time of the pandemic was that Covid-19 was a highly contagious, deadly virus to which the elderly were particularly vulnerable. The Court further takes judicial notice that widespread information at the onset of the pandemic emphasized that transmission of the virus made casual incidental proximity to other people dangerous. As Respondent was a senior citizen at the onset of the pandemic, Respondent's need to isolate from other residents of the multiple dwelling she had been living in would indeed constitute a reasonable excuse for her relocation to the more sparsely-populated accommodations that the Other Address afforded her.
Petitioner argues that Respondent did not adequately research differing levels of Covid infection in New York City and upstate New York. Petitioner further points out that no doctor advised Respondent to relocate to the Other Address. Given the terrifying news the public was receiving in the early months of the pandemic, the Court is disinclined to second-guess judgments that people made to best protect themselves without becoming amateur epidemiologists.
A similar inclination to defer to concerns about Covid infection could possibly apply to the time period after Respondent was vaccinated on February 24, 2021. However, Respondent testified at her deposition that New York City was much safer once the vaccine was available. Respondent's actions after she was vaccinated evinced her willingness to be around other people more, actions such as taking a flight to Santa Fe, visiting shops and galleries in Provincetown, attending family functions with large numbers of other people, including Thanksgiving dinners with more than a dozen family members and a stay in a house in Santa Fe, and visiting [*14]attractions like the Space Center in Bethesda.[FN3]
If Respondent felt safe enough to expose herself to other people indoors after the availability of the vaccine made her feel safer, then why couldn't she regain occupancy if the subject premises after February of 2021?
Respondent's answers to those questions at her deposition and at trial revealed that fear of Covid exposure did not motivate her absence from the subject premises after she was vaccinated. Instead, Respondent testified that she did not resume occupancy of the subject premises after her second vaccination because she "had a choice of where [she] wanted to be", because she was not going to go to concerts and museums or to be with friends, and because she wanted to be where she was more comfortable. Respondent later testified that everything she did in New York City that made her life really important had been closed down. An unavailability of amenities in New York City does not amount to a "reasonable ground" for an absence from a Rent-Controlled apartment pursuant to 9 N.Y.C.R.R. §2204.6(d)(vi).
Respondent also testified that she did not relocate back to the subject premises because Co-Respondent and his family were there. As the record shows that Respondent was vaccinated as of February 24, 2021 and that Co-Respondent did not move into the subject premises until July 4, 2021, this testimony does not explain Respondent's absence during this interim timeframe. In any event, Respondent's voluntary permission for Co-Respondent and his family to take up residence in the subject premises also does not amount to a reasonable ground for an absence from a Rent-Controlled apartment. Quite the opposite is the case, in fact. Subletting is a factor in determining that a tenant does not maintain a Rent-Controlled apartment as their primary residence, 9 N.Y.C.R.R. §2200.3(j)(4), and a sublet can be presumed when a tenant does not live in their apartment and someone else does. 27 W. 84th St. Tenants Ass'n v. Knight, 11 Misc 3d 129(A)(App. Term 1st Dept. 2006). This legal proposition makes particularly striking Respondent's testimony that Co-Respondent's family's occupancy of the subject premises was one of the "biggest" reasons that she did not return there.
Respondent therefore did not prove by a preponderance of the evidence that her absence from the subject premises was temporary and excusable as contemplated by 9 N.Y.C.R.R. §2204.6(d)(vi) once she was vaccinated. Petitioner has therefore proven an entitlement to a judgment. It is ordered that the Court awards Petitioner a final judgment against Respondent. As the record shows that Co-Respondent does not live in the subject premises, the Court dismisses this proceeding as against Co-Respondent. Issuance of the warrant of eviction is permitted forthwith, execution thereof stayed through March 31, 2024 for Respondent to vacate. On default, the warrant may execute after service of a marshal's notice. The earliest eviction date is April 1, 2024.
This constitutes the decision and order of the Court.
Dated: February 29, 2024
New York, New York
HON. JACK STOLLER
J.H.C.

Footnotes

Footnote 1:The same standard applies to dwellings subject to the Rent Stabilization Law. Katz Park Ave. Corp. v. Jagger, 11 NY3d 314, 317 (2008).

Footnote 2:Respondent cites to a decision this Court wrote in an unreported case, Winston & Lola Real Estate LLC v. Headly, Index # L/T 58486/2018 (Civ. Ct. NY Co.), in support of her argument that her absence from the subject premises does not implicate her primary residency. However, the cases are distinguishable. The respondent in that proceeding was essentially crashing on a friend's couch, albeit for a long period of time. The respondent in that proceeding was not the co-owner of real estate with a spouse.

Footnote 3:These activities would expose Respondent to other people indoors more than the activities that she engaged in before being vaccinated, such as riding a ferry, going on a whale-watch tour, eating in an outdoor restaurant, and staying in a hotel room.